# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

JOSEPH SMITH, an individual, and
ALEXANDRA LAFORCE SMITH,
an individual,

      Plaintiffs,                             CASE NO.: 8:25-cv-03019

v.                                   **DEMAND FOR A**
                                     **JURY TRIAL**

ATHLETES AND CAUSES, INC., a        **INJUNCTIVE AND**
Florida not-for-profit corporation,     **DECLARATORY RELIEF**
                                     **REQUESTED**

      Defendant.

_____/

## COMPLAINT

Plaintiffs, Joseph "Joe" Smith and Alexandra "Allie" LaForce Smith, sue Defendant, Athletes and Causes, Inc. ("**A+C**"), and allege as follows:

### Parties and Nature of the Dispute

1.     Plaintiffs Joe Smith and Allie LaForce Smith are individuals, husband and wife, and reside in Vermillion, Ohio.  Joe is a former Major League Baseball pitcher, and Allie is a television host and sideline reporter covering nationally broadcasted National Basketball League and college basketball games and was the winner of the 2005 Miss Teen USA beauty pageant.

2.     Joe and Allie have sought to use their public platforms to help eradicate Huntington's Disease ("**HD**") through their "HelpCureHD" philanthropy and

program ("**HelpCureHD**"), which since approximately 2018 has provided grants to families at risk of passing HD to their unborn children so they may undergo expensive treatment for Pre-implantation Genetic Diagnosis (PGD), which screens embryos for HD before they are implanted using in-vitro fertilization (IVF) ("**PGD/IVF**"), the only known way to ensure HD is not passed on. Since 2018, Joe and Allie's HelpCureHD program has provided grants to over 170 such families.

3.    A+C is a not-for-profit Florida corporation with its principal place of business in Thonotosassa, Florida, and was formed in 2014 by Robert "Rob" Canton purportedly "to support the philanthropic efforts of angles, athletes, artists and influencers who protect, educate, mentor, and instill hope." (https://athletesandcauses.org).

4.    When Joe and Allie first met Canton, Canton represented A+C as a charitable organization itself, advised by a "Board" consisting of some of Tampa Bay's and the sports world's most respected figures, including Derrick Brooks, Jeff Vinik, BJ Crombeen, Sam Fuld, Nicole Johnson, Jay Mize, and others. Canton represented that HelpCureHD did not need to function as and incur the administrative costs and burdens of a stand-alone charitable organization and instead, could be folded under the umbrella of A+C.

5.    In 2017, Joe and Allie entered into an agreement with A+C to help grow the HelpCureHD cause and turned over to A+C the day-to-day management of

2

HelpCureHD, while Joe and Allie focused on the fundraising aspects and identifying families at risk of passing on HD to their children to receive grants for PGD/IVF treatments.  Under the Agreement, the funds raised in the name of HelpCureHD would be donated and managed by A+C (ostensibly as advised by the purported distinguished "Advisory Board") and deployed for HelpCureHD's specific purpose.

6.     In 2024, as the expiration of Joe and Allie's Agreement with A+C approached, essential members of A+C's staff were leaving A+C, internal A+C disputes began to interfere with HelpCureHD's mission, and Canton began engaging in increasingly erratic behavior.

7.     For these reasons, among others, Joe and Allie decided they would not renew their agreement with A+C.

8.     After Joe and Allie informed Canton of their decision, Canton became vindictive and resentful towards Joe and Allie, and refused to meaningfully cooperate in the transition of HelpCureHD away from A+C so that it could continue Joe and Allie's charitable purposes.

9.     Joe and Allie were shocked that an organization supposedly endorsed and advised by so many distinguished members of the Tampa Bay and sports communities would act in such a way and thwart the charitable purposes of the HelpCureHD program.

10.    In March 2025, A+C abruptly removed from the A+C website the "Advisory Board" page and all references to the purported members of A+C's "Advisory Board."  Joe and Allie began to learn that several of the people A+C had represented for years were members of A+C's "Advisory Board" had never agreed to be part of, nor participated in any meetings of, A+C's "Advisory Board," had never provided their consent to be associated in any way with A+C and, in some cases, had never even heard of A+C.

11.    As Joe and Allie have now discovered, A+C's misrepresentations to the effect that each member of its purported "Advisory Board" sponsored or endorsed A+C's solicitations for donations, approved of A+C's purposes, or were connected with A+C, were made to obtain donations and to induce public figures, like Joe and Allie, to bring their charitable causes under the umbrella of A+C and provide to and solicit donations for A+C in the name of those causes.

12.    Although Joe and Allie's agreement with A+C has expired, A+C and Canton are now holding hostage hundreds of thousands of dollars and other assets raised for HelpCureHD's charitable purposes, and insisting that A+C can continue to charge and take for itself "management" and "advisory" fees to pay phantom expenses that A+C claims to have incurred, but refuses to support, from the funds raised for HelpCureHD.

13.    As a result, Joe and Allie are forced to bring this action against A+C to: (a) ensure funds in the possession of A+C that were donated by hundreds of individuals specifically for the HelpCureHD program are used for the charitable purposes for which they were donated; (b) obtain from A+C a proper accounting of all funds donated to and the legitimate and agreed to expenses of the HelpCureHD program and ensure that A+C complied with its contractual obligation to "process contribution receipts and acknowledgements for all donations to the foundation"; (c) obtain a declaration that certain property, including the HelpCureHD social media accounts, promotional videos and photographs, client, clinic-partner, and donor lists that were developed by and for the HelpCureHD program and managed by A+C during the term of the agreement, which A+C is now holding hostage or deleting, belong and must be provided to Joe and Allie so that they may continue their mission for the HelpCureHD program; and, (d) obtain a declaration that the funds A+C is holding that were raised for and donated to the HelpCureHD program must be used for their intended and limited purpose—the HelpCureHD PGD/IVF grant program.

14.    In addition, Joe seeks to recover from A+C the nearly $500,000 Joe personally donated to A+C in the name of HelpCureHD during the time A+C was mispresenting that all members of A+C's purported "Advisory Board" endorsed and were connected with A+C, in violation of § 496.415, Fla. Stat., which makes it unlawful to solicit charitable donations based on false endorsements.  Joe intends to

redeploy 100% of his recovered donations to HelpCureHD's purpose to provide grants for PGD/IVF treatments for families at risk of passing HD to their unborn children.

## Venue and Jurisdiction

15.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the Plaintiffs are citizens of Ohio, Defendant is a citizen of Florida, and the amount in controversy exceeds the sum or value of $75,000.

16.    Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendant resides in this district.

## General Allegations and Factual Background

17.    Joe and Allie share a deeply personal mission to raise awareness of and combat HD, an inherited neurodegenerative disease for which there is presently no known cure.  Joe's mother and grandmother were diagnosed with, and ultimately lost their lives to, HD, and Joe has a 50% chance of inheriting the disease himself.

18.    Likewise, any children Joe and Allie naturally conceive have a 50% chance of inheriting HD.  Joe and Allie's two sons (the first born in 2022 and the second just born in October 2025) were conceived by PGD/IVF, which allowed Joe and Allie to ensure their sons were born without the disease.

19.     PGD/IVF is the only way families at risk of HD can guarantee that their biological child will be HD-free.  PGD/IVF, however, comes at a steep price, often up to $40,000.

20.     Motivated by their personal journey and their devotion to helping those suffering with HD, Joe and Allie committed themselves to philanthropy and sought to use their platforms as public figures to raise funds to help families at risk and fund research for HD.

21.     Joe and Allie built HelpCureHD and its donor base and through their HelpCureHD platform originally raised money for

22.     As they began to dedicate more of their time and efforts to their HelpCureHD philanthropy and it began to grow, Joe and Allie realized they would need professional help to assist them in running the philanthropy and to grow it to an organization that could make a meaningful difference in the lives of families at risk of HD.

### Robert Canton, A+C, and A+C's Purported Advisory Board

23.     In or about 2017, Joe and Allie were introduced to Canton and his entity, A+C.

24.     Canton represented to Joe and Allie that A+C could help Joe and Allie with their HelpCureHD philanthropy by setting it up as a "Donor Advised Fund" under the umbrella of A+C, with A+C taking on the fiscal responsibility and all

administrative burdens of a charitable foundation and providing staff and support to assist Joe and Allie in running their HelpCureHD philanthropy.

25.     Joe and Allie first entered into an agreement with A+C in 2017, under which A+C administered and provided services to support Joe and Allie's HelpCureHD as a "Donor Advised Fund."

26.     Under this arrangement, HelpCureHD and Joe and Allie's mission to create awareness and raise funds for HD research became one of A+C's "causes." A+C was the 501(c)(3) non-profit organization to which all funds would be donated.

27.     As explained by Canton, under IRS and other applicable regulations, Joe and Allie could make recommendations for, and had advisory privileges over, the distribution of funds donated to A+C in the name of HelpCureHD and Joe and Allie, but once donated, the funds were assets of A+C and A+C had the ultimate discretion and responsibility as to how to deploy those funds to support the HelpCureHD mission.

28.     Canton represented that A+C's discretion would be exercised by him as CEO of A+C and in accordance with the philosophical direction and advice of A+C's purported "Advisory Board."

29.     From at least January 2016 through March 2025, A+C represented on its public facing website that A+C and its causes were endorsed, and that A+C was

advised, by each member of its purported "Board," alongside a "Ways to Give" link through which the public would donate money to A+C.

30.    A+C did so to induce persons, including Joe and Allie, to donate to A+C and its various causes and to induce others who wished to pursue philanthropic causes, like Joe and Allie, to enter into agreements with A+C under which donations to A+C, in the name of the various causes, were solicited.  Under those agreements, A+C would charge fees on the solicited donations and retain control over the donated funds.

### Joe and Allie entered into a "Fiscal Sponsorship Agreement" with A+C

31.    From 2014 when Joe and Allie first started HelpCureHD through 2018, the mission of HelpCureHD became more focused on assisting families at risk of HD in ensuring their children would not be born with HD.

32.    To better serve this mission, Joe and Allie decided their charitable efforts would be dedicated to funding a grant program to fund PGD/IVF treatments for families at risk of HD who could not afford such treatments on their own.

33.    To better run such program under the A+C umbrella, which would require dedicated staff just for the HelpCureHD grant program, Canton suggested Joe and Allie renew their contract with A+C under a "Fiscal Sponsorship" format rather than the "Donor Advised Fund" format under which they had been operating since first entering into an agreement with A+C in 2017.

34.     As A+C explains on its website, a "Fiscal Sponsorship" "refers to the practice of non-profit organizations offering their legal and tax-exempt status to individuals & groups to fundraise for charitable projects who want to enrich their communities." A+C states that under a Fiscal Sponsorship, it provides its clients its "tax exempt status so [the clients] can hold fundraisers, apply for grants, and request tax deductible donations." A+C claims that it "provide[s] administrative infrastructure, guidance, and help[s] raise funds for [clients'] charitable causes."

35.     At the time, A+C's website continued to represent that A+C was advised by an "Advisory Board" consisting of some of Tampa Bay's and the sports world's most respected figures,

36.     At the end of the term of the original "Donor Advised Fund" agreement, Joe and on June 18, 2019, Joe and Allie entered into a new agreement with A+C, titled the Athletes+Causes Joseph Smith and Allie LaForce Fiscal Sponsorship Agreement, a copy of which is here attached as **Exhibit A**.

37.     On June 2, 2022, the parties agreed to extend their contractual relationship and entered into a "HelpCureHD Foundation Services Agreement Extension," which amended the "Effective Date and Term" provision of the original agreement to extend it for another three years to conclude on May 31, 2025, and modified certain fees payable to A+C. A copy of the June 2, 2022, extension is here

attached as **Exhibit B**.  The June 18, 2019, Fiscal Sponsorship Agreement and the

June 2, 2022, extension of it are collectively referred to as the "**Agreement.**"

38.    Under the Agreement, A+C is the "Sponsor" and Joe and Allie are the

"Requestor."

39.    The purpose of the Agreement, as set out in the first paragraph of it,

was

> for the ***management and development of a grant program*** that will
> provide financial support to families undergoing Pre-implantation
> Genetic Diagnosis (PGD), which screens embryos for Huntington's
> Disease before they are implanted using in-vitro fertilization (IVF).
> This PGD/IVF grant program ("HelpCureHD" or "HCHD" or
> "Foundation" or "Program") ***represents the philanthropic endeavors***
> ***of Joe Smith and Allie LaForce***.

(emphases supplied)

40.    To that end, the Agreement required A+C to, among other things:

provide foundation, special events, and public relations services to HelpCureHD;

assist in raising funds and generating awareness for HelpCureHD; professionally

manage HelpCureHD's implementation; and, distribute funds to help patients with

the costs of PGD/IVF.

41.    During the entire term of the Agreement, Joe and Allie actively worked

to promote the HelpCureHD program and donated substantial amounts of their own

money to the HelpCureHD program.

42.     Joe and Allie personally solicited and obtained both cash and noncash donations as well as monetary sponsorships for events for the benefit of the HelpCureHD program.

43.     Noncash assets Joe and Allie obtained include sports memorabilia signed by other athletes that was obtained by and provided specifically to Joe and Allie for them to use as auction items for HelpCureHD events.  In some instances, memorabilia items (such as bats, or trading cards) were purchased by A+C using funds donated to HelpCureHD and Joe and Allie would have them signed by sports figures so they could be auctioned at HelpCureHD events.  When those items were sold at auction, A+C would charge at 10% fee on the auction price of the sold item.

44.     While the Agreement provided that A+C would be required during the term  of the Agreement to "develop" "maintain," and/or "manage" "for the Foundation" nearly all aspects of the foundation, including certain assets (e.g. "fundraising opportunities," "noncash" donations, "PR efforts," "media lists," "social media," and a website), nothing in the Agreement provides A+C with ownership of any of the assets developed, maintained, or managed by A+C during the term of the Agreement.

45.     The Agreement specifically provides that "[a]ny tangible or intangible property, including copyrights, obtained or created by Requestor as part of the Project shall remain the property of Requestor."

46.    The Agreement further specified that A+C would "***administer*** a grant program whereby individual applicants for a HelpCureHD PGD-IVF grant will be screened and selected, and payments for PGD-IVF services coordinated with the fertility clinic." (Emphasis supplied).

47.    To that end, A+C agreed in the Agreement that during the term of the Agreement, A+C would

> receive from clinics across the country, for the purposes of the charitable activities described herein. In furtherance of its charitable purposes, Sponsor shall create a **restricted fund designated for the purposes of the Program** and has decided to grant all amounts that it may receive from Donors and other contributors for the purposes of the Program, less any administrative charges as set forth below, to the clinics and other related organizations providing the PGD/IVF services or, at the request of Requestor, to another public charity, subject to the terms and conditions herein.  (Emphasis supplied).

48.    While the Agreement specifies that A+C, as "Sponsor" "retains full legal ownership of, and discretion and control over, funds contributed to [A+C] for the purposes of the Project and placed in the restricted fund," it goes on to provide that A+C, as "Sponsor," "holds the restricted fund in charitable trust under the laws of the State of New York, ***so that uses of the fund are limited to the Project's purposes***." (Emphasis supplied).

49.    Thus, A+C is not permitted to use any of the funds donated for the HelpCureHD program or "Project" for anything other than PGD/IVF services.

50. That is, the funds raised for and in the name of the HelpCureHD program were to be held by A+C in the "restricted fund" and were not to be commingled with the funds of any other funds of A+C or any other "foundations" or programs under A+C's management, and were not available to A+C to use for its general operating expenses or general purpose.

51. For A+C's management and other services provided under the Agreement, the Agreement provide for specified fees to A+C, including "$15,000 per quarter," 10% of funds raised and the value of non-cash assets donated, and 1% of the average annual asset balance, which fees A+C deducted from the funds donated to A+C in the name of HelpCureHD. During the term of the Agreement, direct costs of the HelpCureHD program, such as for events to raise funds, were paid from the restricted fund.

52. The Agreement, by its own terms, ultimately expired on May 31, 2025.

53. During the entire term of the Fiscal Sponsorship Agreement, A+C continued to represent, including on A+C's website, that A+C and its causes were endorsed, and that A+C was advised, by each member of its purported "Board" which provided oversight, or at least advice, regarding A+C's management of funds and relationship with the various causes under its umbrella, including HelpCureHD.

54. In the final days before the Agreement was to expire, the parties discussed a supplementary termination agreement, which Joe and Allie hoped would

facilitate a smooth transition of HelpCureHD from A+C to a new fiscal sponsor, Horizon Community Funds of Northern Kentucky ("**Horizon**") and ensure all available funds donated in the name of HelpCureHD over which A+C had control would be used for the purposes of which they were intended as required by the Agreement

55.     Although the parties nearly mutually assented to terms, negotiations fell apart when A+C's principal, Canton, refused to provide a full detailed accounting of HelpCureHD's account prior to Joe and Allie signing a release of all claims against A+C and insisted that A+C was entitled to funds from the restricted fund that it could use for any purposes, instead of the purposes of which the funds were donated.  Of course, Joe and Allie could not, and would not, agree to allow A+C and Canton to use for their own purposes funds that had been donated to help families ensure their children would not be born with HD.

### *A+C Refuses to Account for the Balance of the HelpCureHD Restricted Fund and Provide Joe and Allie Access to the Other Assets of the HelpCureHD Program, or return property obtained by Joe and Allie as part of the HelpCureHD Project.*

56.     Since the expiration of the Agreement, despite repeated demands, A+C has refused to provide to Joe and Allie any statements accounting for the donated funds and expenses A+C has charged to the HelpCureHD fund.

57.     Instead, A+C asserts that A+C is entitled to (a) use and distribute those funds as it sees fit, and (b) continue to collect for itself monthly fees out of the

donated funds, both without any oversight or accountability at all, or any agreement in place allowing it to do so.

58.    The Agreement by its own terms only provides for payments during its term and "service fees up to the official date of termination," meaning that any additional fees A+C has removed for itself from the HelpCureHD restricted fund after May 31, 2025, or removes in the future, are unauthorized.

59.    Since the Agreement expired, A+C has also refused, despite multiple demands, to provide to Horizon, or to Joe and Allie, complete access information and login credentials for HelpCureHD's website, social media, and email accounts, and photos and videos provided to the HelpCureHD program by participants and grantees.[1] A+C instead claims that it has the exclusive rights to that property under the Agreement.

60.    A+C went so far as to remove from the HelpCureHD YouTube channel videos that were created for the promotion of the HelpCureHD Project and played at all HelpCureHD programs, and for which HelpCureHD funds were used to

---

[1] Joe and Allie, however, at A+C's insistence, transferred and to their own credit card payment for the HelpCureHD.org website.  Eventually, because their credit card was the payment method for the account, Joe and Allie were able to gain access to the HelpCureHD.org website domain and launch a new HelpCureHD website at the original domain, HelpCureHD.org.  Joe and Allie have also been able to secure access to the HelpCureHD Instagram account, which A+C had attempted to hold hostage, even though it was created by Joe and Allie before ever entering into any agreement with A+C.

produce, so that Joe and Allie would no longer have access to the videos for use in the continued promotion of the HelpCureHD mission.

61.    A+C has also refused to provide to Horizon, or to Joe and Allie, spreadsheets containing contact and other logistical information of donors and clinics that have supported HelpCureHD and its mission—the vast majority of whom Joe and Allie brought to HelpCureHD in the first place.

62.    A+C has also refused to return to Joe and Allie items obtained by them, including items of signed sports memorabilia provided by athletes specifically to Joe and Allie as part of the HelpCureHD Project.

63.    A+C has also refused to acknowledge or "process contribution receipts and acknowledgments" for certain in-kind donations made by Joe and Allie.

64.    A+C also, while claiming that its former employees are bound by non-compete agreements and baselessly threatening Joe and Allie with legal action if they communicated with A+C's former employees, refused to identify to Joe and Allie which of its former employees are subject to a non-compete to enable Joe and Allie to avoid potential interference with those purported agreements.

65.    In fact, A+C has expressly refused to provide any additional documentation to Joe and Allie "until such time that we are in the discovery phase of litigation."

66.    Meanwhile, A+C is depleting the balance of HelpCureHD's funds. Indeed, as summarily reported by A+C, the HelpCureHD account balance on March 17, 2025, was $369,726.24, but on or around late June 2025, was summarily reported to be $277,796.67.  A+C refuses to provide to Joe and Allie any accounting of the $91,930.07 that apparently disappeared from the restricted fund between March 17 and late June 2025, or any of the funds A+C has removed since that time.  As a result, Joe and Allie currently have no idea if the money that A+C has removed from the HelpCureHD restricted fund went to support the charitable purposes for which it was intended, or what of it was taken by A+C as some kind of (likely unauthorized and improper) "fee."

### *In the Meantime, A+C is Mismanaging the Grant Program and Negatively Impacting HelpCureHD's, and Joe and Allie's, Reputations.*

67.    While A+C's stated justification for "denying" Horizon as a successor was A+C's supposed superior knowledge and experience in running a PGD/IVF grant program, A+C has mismanaged the program since the Agreement's term ended.

68.    There are several families currently undergoing PGD/IVF procedures under the HelpCureHD program who were approved during the term of the Agreement.

69.    A+C, however, despite its purported expertise, failed to timely and professionally arrange to pay for bills for these patients—which is the entire purpose of HelpCureHD.

70.    As just one example, a representative of one fertility clinic messaged Allie directly to let her know that the clinic could not get in touch with anyone to handle the finances and initiate the medical process, which A+C claims to be currently doing and is actively precluding Horizon, or Joe and Allie, from taking over themselves:



71.    In fact, because of A+C's failures, and but for Allie's own direct involvement, the clinic was expecting to have to charge that patient for medical procedures that should have been covered by that patient's HelpCureHD grant:



72.    Other patients have reached out to Allie, directly or through others, attempting to have paid by HelpCureHD medical bills HelpCureHD had committed to pay via grants for PGD/IVF procedures, but A+C had failed to pay.

73.    A+C did not pay the legitimate expenses of these families until after Joe and Allie were forced to confront A+C and Canton with these communications and demand that it pay from the HelpCureHD fund balance the bills for participants who were approved for the grant program prior to the expiration of the Agreement.

74.    As another example, Joe and Allie learned that shortly after the expiration of the Agreement, a clinic that had supported the HelpCureHD program for years donated specifically to the HelpCureHD program vouchers for PGD/IVF worth tens of thousands of dollars.  A+C, however, never informed Joe and Allie that those vouchers had been donated.  If Allie had not by happenstance learned that the clinics had donated the vouchers, they would never have been available to help needy families.

75.    A+C's failures to appropriately administer the funds donated to HelpCureHD, despite claiming that it has the right and responsibility to do so, has harmed and continues to harm the public images and reputations of Joe, Allie, and their HelpCureHD mission.

76.     A+C's failures are especially egregious given that the process, despite A+C's constant attempts to obfuscate and overcomplicate it, is relatively straightforward.  When a family applies and is accepted for a HelpCureHD grant, their clinic sends the family's bills directly to HelpCureHD, which pays them out of its donated funds.

77.     A+C's failures since the end of the Agreement's term make apparent that A+C is attempting to hold Joe and Allie hostage out of apparent spite and so that A+C can continue to take from HelpCureHD's funds purported service and administrative fees for "management" duties it is not actually performing and to cover "expenses" of the program it is not actually administering.

78.     In fact, on information and belief, A+C for months before and after the expiration of the Agreement had no employees, and therefore has little to no practical ability to provide any further services to HelpCureHD or to Joe and Allie.

79.     Horizon, on the other hand, is not (as A+C claims) "a local community foundation with no experience."  Rather, Horizon is a nationally accredited 501(c)(3) community foundation with more than 200 funds under its management, and is a trusted fiscal sponsor with established processes in place for receiving, managing, disbursing, and tracking HelpCureHD's funds.

80.     Meanwhile, A+C continues to prominently display Joe and Allie's names, images, and likenesses on its website and social media pages, which A+C

uses to advertise and promote its commercial services, and to thereby imply Joe and Allie's endorsement and support of A+C's business as its "former clients," even though Joe and Allie did not consent to any such use after the end of the term of the Agreement and do not endorse A+C's services.

***Joe and Allie learn A+C Misrepresented its "Advisory Board"***

81.    In March 2025, A+C abruptly removed from its website all references to A+C's purported Advisory Board and each of its purported members.

82.    It is now known that at least multiple distinguished people A+C represented sat on its "Advisory Board" had no idea A+C was representing to the public they were on such a board, never agreed to sit on such board, and never attended any "Board" or other meetings for A&C.

83.    It is now apparent that rather than being an organization overseen, or at least "advised," by multiple distinguished members of the Tampa Bay and sports communities, A+C and its decisions regarding management, use (including to pay itself) and deployment of charitable funds raised for multiple causes endorsed by several public figures, including Joe and Allie, was not subject to any internal oversight, was not being "advised" by all the members of its purported "Advisory Board," and instead had operated at the direction and on the whims of only Canton.

84.    Indeed, Canton's erratic and vindicative conduct directed towards Joe and Allie leading up and to after the expiration of the Agreement would never be

condoned, and certainly not directed or supported, by any rational "Advisory Board," certainly not one made up of the distinguished individuals Canton and A+C represented for years made up A+C's "Advisory Board."

85.    Joe and Allie bring this lawsuit to protect their charitable endeavors, to ensure that all funds donated for the purpose of fulfilling HelpCureHD's mission of eradicating HD through provision of PGD/IVF services reach their intended recipients, rather than wasting away in A+C's (and Canton's) pockets, and so they can continue to pursue the mission of HelpCureHD and help families at risk of passing HD to their children.

86.    All conditions precedent to the claims asserted herein have been met, waived, or otherwise excused.

## COUNT I – ACCOUNTING

87.    Plaintiffs reallege paragraphs 1 through 86 as if fully set forth herein.

88.    This is an action for equitable accounting concerning funds raised, managed, and disbursed by A+C in connection with HelpCureHD, and the funds remaining for distribution to charitable causes consistent with the terms of the Agreement and mission of HelpCureHD.

89.    Pursuant to the terms of the Agreement, A+C was to manage and develop Joe and Allie's HelpCureHD program, manage its implementation, and distribute funds to help patients with the cost of PGD/IVF procedures.

90.     To fulfill its obligations, both under the Agreement and the law, A+C is required to account for all donated funds received for the HelpCureHD Program and all expenses of the HelpCureHD program, including charged imposed by A+C.

91.     Further, pursuant to the Agreement, Joe and Allie are permitted, "at any time and in [their] sole discretion" to "conduct an audit of the Project's activities … to investigate and document that the Project is being carried out in accordance with the [program participant's] approved application, [the Agreement], [A+C's] exempt purposes, and all applicable laws."  The failure of A+C to "provide full cooperation and adequate documentation in the event of an audit" is an express breach of the Agreement.

92.     Despite repeated demands, however, A+C has refused to provide to Joe and Allie any meaningful accounting of:

    a.  The individual and total amount of cash, noncash, and in-kind contributions raised for HelpCureHD;

    b.  The sources and donors of such contributions;

    c.  The expenses incurred and paid by A+C using funds in (or that should be in) the HelpCureHD restricted fund;

    d.  The amount of administrative or other service fees retained by A+C; nor,

    e.  The balance of funds remaining for the benefit of HelpCureHD.

93.    Absent such basic information, Joe and Allie cannot even begin to conduct, or have conducted, any audit permitted under the Agreement.

94.    As a result of A+C's unjustified refusals, Joe and Allie do not know the true balance of the funds raised for the HelpCureHD program that remain available for the purposes of the program.

95.    Joe and Allie are entitled to an accounting in equity to determine the full amount of charitable assets raised and administered by A+C, the lawful use and destination of such funds, and the balance currently available for distribution to IRS-qualified charitable organizations consistent with the purposes of the Agreement.

96.    Joe and Allie lack an adequate remedy at law, and without a full accounting, are unable to ensure that donor funds are lawfully and properly applied for their intended charitable purposes.

**WHEREFORE**, Plaintiffs Joseph Smith and Alexandra LaForce Smith request the Court: (a) order A+C to provide a full and complete accounting of all cash, noncash, and in-kind donations raised, sources of those donations, all expenses incurred or paid from donated funds, and the current balance held for HelpCureHD; (b) require production of all books, records, donor lists, receipts, and other documents evidencing the receipt and use of HelpCureHD-related funds; and, (c) award such other and further relief as the Court deems just and proper.

## COUNT II – BREACH OF CONTRACT
### (Injunctive Relief as to Remaining HelpCureHD
### Funds and Items Obtained by Joe and Allie)

97.    Plaintiffs reallege paragraphs 1 through 86 as if fully set forth herein.

98.    The Agreement provides that even after the Agreement's expiration, as part of its duty to "professionally manage" HelpCureHD, A+C must distribute HelpCureHD's donor funds in accordance with the purposes of the Agreement—i.e., "*a grant program* that will provide financial support to families undergoing Pre-implantation Genetic Diagnosis (PGD), which screens embryos for Huntington's Disease before they are implanted using in-vitro fertilization (IVF)."

99.    A+C has breached its obligation to professionally manage HelpCureHD's donated funds by failing to properly administer and distribute those funds to pay for PGD/IVF procedures for waiting and already approved families, or to even communicate with such families or their clinics regarding upcoming procedures and necessary payments to be made.

100.    A+C's breach has damaged, and continues to damage, Joe and Allie by negatively impacting the public image and perception of Joe and Allie, in that their names are attached to, and indeed are the driving force behind, HelpCureHD.  That is, when A+C fails to properly distribute donated funds to selected and approved families, it reflects poorly on Joe, Allie, and HelpCureHD.

101.    It is, and was at all times, reasonably foreseeable to A+C that any failure by A+C to professionally manage or properly and timely distribute HelpCureHD's donor funds would adversely affect Joe and Allie.

102.    A+C has also breached the Agreement by refusing to return to Joe and Allie noncash assets, including signed sports memorabilia, that was specifically provided to and obtained by Joe and Allie as part of the HelpCureHD Project, which items the Agreement specifies "shall remain the property of the Requestor [Joe and Allie]."

103.    A+C's breach in this regard has damaged, and continues to damage, Joe and Allie by negatively impacting their ability to continue HelpCureHD's mission through use of those items to generate additional funds and also negatively impacts their ability to obtain additional donations of such items from.  The harm to Joe and Allie is irreparable in that it cannot be adequately recompensed by money damages.  That is, there is no adequate remedy at law.

104.    The public interest supports the relief requested herein, because the public has interests in both the enforcement of valid contractual obligations and the use of donated charitable funds for their intended public philanthropic purpose.

**WHEREFORE**, Plaintiffs Joseph Smith and Alexandra LaForce Smith demand judgment requiring A+C to properly and timely distribute the donor funds in accordance with and only for HelpCureHD's purpose—"a grant program that will

provide financial support to families undergoing Pre-implantation Genetic Diagnosis (PGD), which screens embryos for Huntington's Disease before they are implanted using in-vitro fertilization (IVF)"—including payment of bills for PGD/IVF procedures of families approved for the HelpCureHD PGD/IVF program prior to the expiration of the Agreement and to return to Joe and Allie all noncash assets, including signed sports memorabilia, that was specifically provided to and obtained by Joe and Allie as part of the HelpCureHD Project; and, for all other additional relief as this Court deems just and proper.

## <u>COUNT III – DECLARATORY JUDGMENT</u>
### (As to HelpCureHD Assets)

105.  Plaintiffs reallege paragraphs 1 through 86 as if fully set forth herein.

106.  A bona fide, actual, and present controversy exists between the parties as to their rights now that the Agreement's term has expired and the Agreement is no longer in effect.

107.  A+C asserts that it "owns" and will not turn over to Joe, Allie, or Horizon, any assets developed, maintained, or managed by A+C for the HelpCureHD program during the term of the Agreement, including the social media accounts, donor lists, promotional photographs and videos, client lists, partner-clinic lists, and donor lists.

108.  The Agreement, however, does not afford A+C any ownership rights as to any of those assets.

109.  Accordingly, Joe and Allie are in doubt and uncertain as to their rights and status with respect to the legal ownership of and/or control over the property identified above.

110.  A+C also claims that it is entitled to retain all funds donated for the HelpCureHD program and held in the restricted fund and to charge and remove from the restricted fund "management" and "advisory" fees for it's A+C's own purposes and to pay from funds in the restricted fund "expenses" that A+C claims are incurred for HelpCureHD.

111.  The Agreement, however, does not state that such fees and expenses may be paid from the restricted fund after the expiration of the term of the Agreement.

112.  A+C further claims that it owns all memorabilia donated for HelpCureHD or purchased using HelpCureHD funds and then signed by contacts of Joe and Allie at their request.

113.  Joe and Allie maintain that A+C must account for all such items and either return them to the donors or use funds from the sale of such items only for the specific purposes of HelpCureHD—a PGD/IVF grant program.

114.  Accordingly, doubt exists as to whether A+C may continue to charge, and take from the funds donated to HelpCureHD money to pay, A+C's "advisory" and "management" fees and other expenses A+C claims to be incurring

115.  A+C asserts an adverse and hostile claim to the ownership of and control over that property, creating a justiciable controversy requiring immediate judicial resolution.

116.  Thus, Joe and Allie have no adequate remedy at law and seek a declaration to resolve the existing uncertainty and guide their future conduct as it pertains to their efforts to advance, and raise money for, their charitable cause.

**WHEREFORE**, Plaintiffs Joseph Smith and Alexandra LaForce Smith demand judgment declaring that: (1) all assets that A+C previously created, developed, managed, maintained "for the foundation," including the HelpCureHD social media accounts, donor lists, promotional photographs and videos, client lists, partner-clinic lists, and donor lists, are the property of and must be returned to Joe and Allie; (2) that the funds remaining in the restricted fund, and any funds generated in the future from assets donated to A+C in the name of HelpCureHD, cannot be used to cover "management" and "advisory" fees or pay other expenses of A+C and instead must be used only for HelpCureHD's purpose—"a grant program that will provide financial support to families undergoing Pre-implantation Genetic Diagnosis (PGD), which screens embryos for Huntington's Disease before they are implanted using in-vitro fertilization (IVF)"; and, (3)  providing all other additional and supplemental relief as this Court deems just and proper.

## COUNT IV – RIGHT OF PUBLICITY
### § 540.08, Fla. Stat.
### (Injunctive Relief as to A+C Website and Social Media)

117.   Plaintiffs reallege paragraphs 1 through 86 as if fully set forth herein.

118.   A+C is currently using Joe and Allie's names, images, and likenesses on its website and social media pages to advertise A+C and its business.

119.   That is, A+C implies Joe and Allie's affiliation with and endorsement of its business and services by listing Joe and Allie as "former clients" and using their names, images, and likenesses in connection with the promotion of A+C's commercial activities.

120.   A+C's use of Joe and Allie's identities was for purposes of trade and advertising within the meaning of Fla. Stat. § 540.08(1), and directly promotes A+C's business and services.

121.   Joe and Allie did not authorize or consent to A+C's use of their names, images, or likenesses for any purpose beyond the term of the Agreement.

122.   As a direct and proximate result of Defendant's unauthorized commercial use of Joe and Allie's names, images, and likenesses, Joe and Allie have suffered harm, including but not limited to reputational injury and loss of the right to control and license their identities for commercial purposes.

**WHEREFORE**, Plaintiffs Joseph Smith and Alexandra LaForce Smith demand judgment enjoining A+C's further unauthorized use of Joe and Allie's

names, images, and likenesses on A+C's website and social media pages, and all other additional relief as this Court deems just and proper.

## COUNT V- VIOLATION OF THE FDUTPA
### (Damages, By Joe )

123.   Plaintiffs reallege paragraphs 1 through 86 as if fully set forth herein.

124.   This count is brought by Joe as a donor to A+C and is not a dispute under the Agreement.  Rather, it is a dispute arising from A+C's violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stats. §§ 501.201 et seq. (the "**FDUTPA**").

125.   A+C solicited charitable donations from Joe to be made to A+C for the benefit of the HelpCureHD mission and cause.

126.   A+C, in connection with its charitable solicitations and promotions, made knowingly false representations that A+C was supported and advised by an Advisory Board of reputable individuals and that each member of the Advisory Board endorsed A+C's solicitations, approved of A+C's purposes and was connected with A+C, when at least certain of those individuals did not endorse A+C's solicitations, did not approve of A+C's purposes, never sat on or met as any "Board" of A+C, were not connected with A+C, and had not given A+C written consent to use their name as used by A+C.

127.   Indeed, A+C's website from at least January 2016 through March 2025 represented that A+C had an "Advisory Board" of distinguished members of the

Tampa Bay and sports communities, and identified purported members of the "Advisory Board" even though it knew that at least some of those persons identified did not endorse A+C or its solicitations, did not approve of A+C's purposes, never sat on or met as any "Board" of A+C, were not connected with A+C, and had not given A+C written consent to use their name as used by A+C.

128.   A+C's misrepresentations regarding members of its purported "Advisory Board" constitute violations of § 496.415(3) and (13), Fla. Stat., which prohibit false endorsements and deceptive practices in charitable solicitations.

129.   A violation of § 496.415 constitutes a per se violation of the FDUPTA.

130.   A+C, through Canton, directly solicited Joe to make donations to A+C, which Joe did, for HelpCureHD's specific purposes and against which A+C charged fees.

131.   A+C's deceptive and unfair practices caused Joe actual damages, including nearly $500,000 in donations Joe made to A+C for the benefit of HelpCureHD.

**WHEREFORE**, Plaintiff Joseph Smith demands judgment against A+C for actual damages, attorneys' fees and costs pursuant to § 501.2105, Fla. Stat., and providing all other additional relief as this Court deems just and proper.

## COUNT VI- VIOLATION OF THE FDUTPA
### (Injunctive Relief )

132.   Plaintiffs reallege paragraphs 1 through 86 and as if fully set forth herein.

133.   A+C, in connection with its charitable solicitations and promotions continues to include on its website Joe's and Allie's names, images, and likeness as "its "Former Clients" and includes Joe and Allie's HelpCureHD logo under the heading "Our Current and Former Family of Charities."

134.   On the same website page, A+C solicits charitable donations through a "Donate" button and "Ways to Give" link, each of which takes users to a page at which they are asked to donate funds to A+C.

135.   As such, A+C is making misrepresentations or misleading statements to the effect that Joe and Allie sponsor or endorse A+C's solicitations for donations to A+C, approve of A+C's purpose, or are connected with A+C.

136.   Upon the expiration of the Agreement, A+C has no right to use Joe's or Allie's names, images, or likenesses in any way, and certainly not to make statements to the effect that Joe and Allie sponsor or endorse A+C's solicitations for donations to A+C, approve of A+C's purpose, or are connected with A+C.

137.   Not only have Joe and Allie not given A+C written consent to use their names on the A+C website or for any purpose, since the expiration of the Agreement, they have repeatedly demanded A+C remove from its website all references to them,

and cease making any representations to the effect that Joe and Allie sponsor or endorse A+C's solicitations for donations to A+C, approve of A+C's purpose, or are connected with A+C.

138.   Accordingly, A+C is violating §§ 496.415(3) and (13), Fla. Stat., which constitutes a per se violation of the FDUTPA.

139.   Joe and Allie are each a "person aggrieved" by A+C's violation of FDUTPA because A+C is using Joe's and Allie's names, images, and likenesses to solicit and obtain charitable donations from the public for A+C.

**WHEREFORE**, Plaintiffs Joseph Smith and Alexandra LaForce Smith demand judgment (1) enjoining A+C's further unauthorized use of Joe and Allie's names, images, and likenesses on A+C's website and social media pages to make it appear Joe and Allie sponsor or endorse A+C's solicitations for donations to A+C, approve of A+C's purpose, or are connected with A+C; (2) awarding attorneys' fees and costs pursuant to § 501.2105, Fla. Stat.; and (3) providing Joe and Allie all other additional relief as this Court deems just and proper.

Plaintiffs demand a trial by jury of all claims so triable.

Dated this 4th day of November, 2025.

*/s/ E. Colin Thompson*
**E. COLIN THOMPSON**
Fla. Bar No.: 684929
ColinT@BLHTlaw.com
KerriR@BLHTlaw.com
HeatherW@BLHTLaw.com

eservice@BLHTLaw.com
**JALEN A. LaRUBBIO**
Fla. Bar No. 1039258
JalenL@BLHTlaw.com
KerriR@BLHTlaw.com
**BARTLETT LOEB HINDS**
**THOMPSON & ANGELOS**
1001 Water Street, Suite 475
Tampa, Florida 33602
Phone: (813) 223-3888
Fax: (813) 228-6422
***Attorneys for Plaintiffs***
***Joe Smith & Allie LaForce Smith***